UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

GILBERT DANIEL YLIZ,

    Petitioner,

vs.

ANTHONY HEDGPETH, Warden,

    Respondent.

No. C 08-4419 PJH (PR)

**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS AND GRANTING CERTIFICATE OF APPEALABILITY**

This is a habeas corpus case filed pro se by a state prisoner pursuant to 28 U.S.C. § 2254. The court ordered respondent to show cause why the writ should not be granted. Respondent has filed an answer and a memorandum of points and authorities in support of it, and has lodged exhibits with the court. Petitioner has not filed a traverse. For the reasons set out below, the petition is denied.

**BACKGROUND**

Petitioner was convicted by a jury of three counts of forcible sexual penetration, one count of forcible oral copulation, and one count of misdemeanor trespassing. Ex. F (opinion of the California Court of Appeal) at 1.[1] He was sentenced to prison for twenty-four years. *Id.* The following facts are excerpted from the opinion of the California Court of Appeal:

> Cheryl S. (the victim) and her husband Doug S. lived in a house in a rural area of Aptos, where they had resided since 1990. Their daughter Katie S. lived with them in this house until she moved away in September 2000 at the age of 18 to attend college in Southern California. Katie's bedroom, before she left for college, was at one end of the long, 4,000 square-foot, one-story home, and the master bedroom was at the other end. Katie met

---

[1] Unless otherwise indicated, citations to "Ex." are to the state court record lodged with the court by the Attorney General.

defendant in October 1997 when she was 15 years old. Defendant was about two years older than she. They began a dating relationship that included sexual intercourse, and he was her boyfriend for less than a year. Doug and Cheryl first met defendant when, at their invitation, he came to a party at their home in December 1997. They invited defendant to their home a second time for dinner on his birthday. On a third occasion, defendant and his brother visited the home. After Katie had been seeing defendant for a while, Doug and Cheryl came to dislike him. They told Katie that she could only see defendant at their home and only when one of them was present. Eventually, Doug and Cheryl forbade Katie from seeing defendant.

Katie did not obey these restrictions. Defendant and Katie often spent time together at defendant's family's home in Watsonville. In addition, on four or five occasions, defendant called Katie and arranged to come over to her house in the evening without her parents' knowledge. On these occasions, defendant knocked on her bedroom's exterior door, and she let him into her bedroom. One time, defendant came over without calling first and startled Katie when he knocked on her bedroom's exterior door. She let him in. One of these times, he spent the entire night in her bedroom. Katie always wore underwear, shorts and a top to bed. She never wore a nightshirt.

Katie broke up with defendant in the summer of 1998, but she continued to see him occasionally. They occasionally kissed or had sexual contact. Their last sexual contact was in the summer of 1999, when defendant came to her house to visit. During Katie's senior year of high school (1999-2000), she occasionally saw defendant, but they no longer had a sexual relationship and did not spend much time together. Katie last saw defendant in the summer of 2000 at a barbecue.

Shortly after Katie moved away in September 2000, Doug converted Katie's bedroom into an office. Katie never again lived at the house. Before Katie moved away, defendant frequently left messages on Katie's answering machine. He often used fake names because Doug and Cheryl had told Katie that they did not want him to call anymore. After Katie moved away and her telephone was disconnected, defendant began leaving messages on Doug and Cheryl's answering machine. Cheryl spoke to him at one point and told him that Katie did not live there anymore. On the few occasions when Katie came home to visit during college, she almost always brought her college boyfriend home with her.

Doug and Cheryl's usual prelude to a "romantic evening" would be a nice dinner and a special bottle of wine. Sometimes Doug would drink scotch before they engaged in intimate relations. Both of them always showered and brushed their teeth beforehand. Their intimate relations were always "gentle" and soft and never "rough ." Doug, who is over six feet tall, had never pinned Cheryl down or held her wrists down during their intimate relations. Doug had never "jam[med]" his tongue into Cheryl's mouth or placed his fingers in Cheryl's vagina. He had never awakened her in the middle of the night to have sex. Neither of them liked to be awakened at night. Doug had never "surprised" Cheryl with a desire to have sex.

On February 25, 2003, Doug, who was a commercial airline pilot, was scheduled to fly the next morning, and he had to get up very early. To ensure that both he and Cheryl got a good night's sleep, he typically slept in a guest bedroom on such nights. Doug rarely would have a "romantic evening" with

2

Cheryl the night before he was scheduled for a morning flight because it would disrupt his routine. On the evening of February 25, Doug and Cheryl shared a bottle of "cheap" wine and some fast food, either pizza or burritos, for dinner, and then they watched television for a while. They finished the bottle of wine at about 7:30 p.m. Doug, who was a light sleeper, went to bed in the guest bedroom at 9:00 p.m. Cheryl was still up watching television but starting to doze off in a recliner. Before he went to bed, Doug suggested that she go to bed, but she chose to keep watching television. Cheryl fell asleep in the recliner, as she often did in the evening. She woke up later and went to bed. Cheryl wore a flannel nightshirt and slipper-socks to bed. She did not wear any underwear. Cheryl fell asleep.

Cheryl awoke later in the dark to find a man sitting on her upper legs and holding her wrists above her shoulders with his hands. She was on her back, and her wrists were "being forced, forced down." Cheryl was "disoriented and barely awake." "[M]y first waking thoughts were that something was really weird and wrong, and I subconsciously until I was awake assumed that it had to be my husband...." After about ten or fifteen seconds, Cheryl noticed that the man had dark hair or a dark cap on his head. She "felt a tongue just jammed into" her mouth, and it tasted like hard liquor, vomit and dirty clothes. Cheryl "jerked" her head to one side. She thought "this is gross and something is really wrong." "It occurred to me what if it's not Doug," and she tried to tell herself not to panic. "I knew I was in trouble."

The man "jammed" three fingers into her vagina. Cheryl was still not "fully awake." "It was just shocking and it hurt." She pushed against the man's arms. He was "very forceful." The man put his hand under her nightshirt and roughly squeezed her breasts. Cheryl was "petrified" and "scared that I was going to be killed." Cheryl found this "disgusting" and "gross," and thought "this can't be my husband but it has to be." The man reached around behind her, "yanked [her] up" into a sitting position, and tried to pull her nightshirt over her head, while saying "come on, come on, it will be good."

Cheryl realized that the man was not Doug when the man spoke. When her nightshirt got stuck on her head, the man became "mad" and said "[c]ome on, take it off, take this off." She pushed her arms against his arms. The man "overpowered" her and pushed her back down on the bed. The nightshirt was entirely removed from her body. He again jammed his fingers in her vagina, and he followed up by briefly orally copulating her. While he was orally copulating her, he had his arms "clamped" around her waist or her legs. Finally, while again holding her wrists, the man put something in her vagina. She was not sure if it was his penis or something else. At that point, the light went on, and Cheryl saw Doug standing in the doorway. The entire attack had lasted just three to five minutes.

At 11:35 p.m., Doug was awakened by a creak in the floor that seemed to be coming from the family room. He got up to check whether Cheryl had gone to bed. He saw that she was no longer in the recliner, and he proceeded to the master bedroom. As he approached the master bedroom, he smelled vomit. When he entered the master bedroom, he saw a silhouette on the bed, and Doug, thinking the silhouette was Cheryl, asked "Are you okay?" He heard a groaning sound or a man's voice saying "huh?" Doug immediately switched on the light and saw defendant crouched "on all fours" on top of Cheryl with his head down near her head and his hands up in the

3

area of her head. Defendant grabbed his pants, pulled them up and backed off the bed between Cheryl's legs, saying "whoa, whoa."

Doug could see that Cheryl, who was naked except for her nightshirt partially covering her face, was "totally freaked and petrified" and shocked. Doug grabbed his gun out of his nightstand, pointed it at defendant and asked "who the heck are you?" Defendant put his arms over his face and said "don't shoot me, don't shoot me. I'm only sixteen." Defendant was wearing no shirt or shoes. Doug told defendant to put his head down on the ground, and then Doug put bullets in his unloaded gun. Defendant said something about "I thought it was Jenny," "I'm looking for Jenny," "Jenny dropped me off," and "I'm here to see Jenny." Doug knew of no one named Jenny associated with his home. Defendant never mentioned Katie. Defendant's shoes and shirt were on the master bedroom floor next to the bed. There was vomit on the shoes, shirt and bed. Defendant asked Doug if he could put on his shirt and shoes, and Doug said no. Cheryl recognized defendant's voice.

Doug told Cheryl to go call 911, and Cheryl went all the way to the other end of the house and called 911. She told the 911 dispatcher that she had been raped. Doug continued to hold defendant at gunpoint and maneuvered him into another room where there was a telephone. Defendant said "I don't want to go to jail," and "[d]on't turn me in." He also said "this is just like America's Most Wanted." When Doug picked up the telephone, he heard Cheryl talking to the 911 dispatcher. Doug told defendant "do not move, I'll shoot you." Defendant said "I didn't do anything wrong." He admitted "I was with your wife," but he claimed "I thought she was Jennifer. I didn't know." Defendant said that Jennifer "brought me in" and "told me to wait there I'll be right back." While Doug was on the telephone with the 911 dispatcher, defendant slowly backed his way toward the front door, which was ajar, and escaped. At that point, Doug could hear sirens "right up the street." The police arrived less than a minute later.

Defendant fled through bushes, woods and shrubbery wearing just pants and socks. When defendant arrived at his mother's home in Watsonville early in the morning, he told his mother he had been to "Katie's house" and that he "doesn't remember anything because he blacked out." Cheryl identified defendant in a photo lineup as the man who had assaulted her, and she told the police that she recognized the man's voice as that of defendant. Defendant's DNA was found on Cheryl's neck and genitals, and she suffered bruises to her wrists.

*Id.* at 1-7.

**STANDARD OF REVIEW**

A district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an

4

unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). The first prong applies both to questions of law and to mixed questions of law and fact, *Williams (Terry) v. Taylor*, 529 U.S. 362, 407-09 (2000), while the second prong applies to decisions based on factual determinations, *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

A state court decision is "contrary to" Supreme Court authority, that is, falls under the first clause of § 2254(d)(1), only if "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams (Terry)*, 529 U.S. at 412-13. A state court decision is an "unreasonable application of" Supreme Court authority, falling under the second clause of § 2254(d)(1), if it correctly identifies the governing legal principle from the Supreme Court's decisions but "unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. The federal court on habeas review may not issue the writ "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 411. Rather, the application must be "objectively unreasonable" to support granting the writ. *Id.* at 409.

When there is no reasoned opinion from the highest state court to consider the petitioner's claims, the court looks to the last reasoned opinion. *Ylst v. Nunnemaker*, 501 U.S. 797, 801-06 (1991); *Shackleford v. Hubbard*, 234 F.3d 1072, 1079, n. 2 (9th Cir. 2000). "A state court must be granted a deference and latitude that are not in operation when the case involves review" under the constitutional standard itself. *Harrington v. Richter*, 131 S. Ct. 770, 785 (2011).

## DISCUSSION

Petitioner asserts that his Sixth and Fourteenth Amendment right to put on a defense was violated when the trial court would not allow him to introduce inconsistent out-of-court statements by the victim.

**I.    Standard**

Whether grounded in the Sixth Amendment's guarantee of compulsory process or in the more general Fifth and Fourteenth Amendment guarantees of due process, "the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'" *Holmes v. South Carolina*, 547 U.S. 319, 324 (2006) (quoting *Crane v. Kentucky*, 476 U.S. 683 690 (1986)); *California v. Trombetta*, 467 U.S. 479, 485 (1984) (due process); *Chambers v. Mississippi*, 410 U.S. 284, 294 (1973) (compulsory process).

The right to present a defense also "includes, 'at a minimum . . . the right to put before a jury evidence that might influence the determination of guilt.'" *United States v. Stever*, 603 F.3d 747, 755 (9th Cir. 2010) (quoting *Pennsylvania v. Ritchie*, 480 U.S. 39, 56 (1987)). Thus, the erroneous exclusion of critical, corroborative defense evidence violates the right to present a defense. *DePetris v. Kuykendall*, 239 F.3d 1057, 1062 (9th Cir. 2001) (citing *Chambers*, 410 U.S. at 294, and *Washington v. Texas*, 388 U.S. 14, 18-19 (1967)).

In order to obtain habeas relief on the basis of an evidentiary error, a petitioner must show that the error was one of constitutional dimension and that it was not harmless under *Brecht v. Abrahamson*, 507 U.S. 619 (1993). He would have to show that the error had "'a substantial and injurious effect' on the verdict.'" *Dillard v. Roe*, 244 F.3d 758, 767 n.7 (9th Cir. 2001) (quoting *Brecht*, 507 U.S. at 623).

**II.   Analysis**

One of petitioner's three theories of defense, and the only one relevant here, was a "mistake of fact" defense – that he reasonably and in good faith believed that Cheryl consented to the sexual conduct.

Shortly after Doug called the police, sheriff's deputy Donna Valdivia interviewed Cheryl in the back of Valdivia's patrol car. Ex. F at 9. Cheryl made three statements to Valdivia that night that were contrary to her testimony at trial. *Id.* at 15. The trial court excluded evidence of two of them: (1) "that 'she believed it was her husband' who touched her breast and placed his fingers in her vagina, but that she had nevertheless tried to push that man away because these acts were 'rough;'" and (2) "that, when Doug turned on the lights, 'she saw the male on top of her was not her husband.'" *Id.* at 15. It is the exclusion

6

of these two statements that petitioner contends violated his right to present his defense that he had a reasonable and good faith belief in consent.

The court of appeal concluded that the statements were in fact admissible under sections 770 and 1235 of the California Evidence Code, but that the error was not prejudicial.[2]

As to petitioner's federal claim – the same claim he raises here – the court said:

> Defendant claims that his federal constitutional right to "present a defense" was violated by the exclusion of this evidence, which "gutted the defense." He asserts that this evidence "had strong probative value on an issue central to the mistake of fact defense, whether there was reason for appellant to believe Cheryl was consenting." [FN10. Defendant does not claim that the excluded evidence was relevant to his actual consent or lack of force defenses.] However, he fails to explain how Cheryl's unexpressed state of mind could have played a significant role in defendant's mistake of fact defense. Instead, defendant inaccurately claims that "Cheryl's statements to Valdivia described a scene in which she did not resist because she thought the man on top of her was her husband." This is patently false. In fact, Valdivia's report recounted Cheryl's statement that she had tried to "push the male ... away from her" after he touched her breast and first put his fingers in her vagina because these acts were "rough." Cheryl's statements to Valdivia were, in this regard, consistent with many of her other statements. Although she initially thought, assumed or hoped that the man in her bed was Doug, she nevertheless resisted his unpleasant and unwelcome contact with her.
>
> Cheryl's statement to Valdivia that she knew the man was not Doug when Doug turned on the lights did not add much, if anything, to defendant's mistake of fact defense. His mistake of fact defense necessarily depended on the jury accepting a series of unlikely propositions. First, defendant thought Cheryl was Katie, even though Katie had never slept in the bedroom in which Cheryl was sleeping and Katie always wore shorts, a t-shirt and underwear to bed. Second, he thought Katie, whom he had not even spoken to in years, would welcome his unannounced presence in her bed. Third, a reasonable person would believe that a woman would consent to sexual activity initiated without warning while the woman was asleep by a vomit-covered, intoxicated man sitting on her in the dark. Fourth, a reasonable person would interpret as consent the woman's lack of response under these circumstances. We could go on, but it seems unnecessary.

---

[2] Section 1235 provides: "Evidence of a statement made by a witness is not made inadmissible by the hearsay rule if the statement is inconsistent with his testimony at the hearing and is offered in compliance with Section 770." Cal. Evid. Code § 1235.
Section 770 provides: "Unless the interests of justice otherwise require, extrinsic evidence of a statement made by a witness that is inconsistent with any part of his testimony at the hearing shall be excluded unless:
(a) The witness was so examined while testifying as to give him an opportunity to explain or to deny the statement; or
(b) The witness has not been excused from giving further testimony in the action." *Id.* at § 770.

7

> Whether Cheryl believed that the man in her bed was Doug or not, at any given moment or throughout the events, every one of her statements, including her statement to Valdivia and her trial testimony, indicated that she had resisted the man and had engaged in no equivocal conduct that could possibly be interpreted as consent by a reasonable person. It follow s that the exclusion of a portion of Cheryl's statement to Valdivia did not significantly impact defendant's ability to present his reasonable mistake of fact defense and therefore did not constitute federal constitutional error.

Ex. F at 17-18.

The United States Supreme Court has recently discussed the standard of review for federal courts considering a habeas petition directed to a state court judgment, as here: "A state court must be granted a deference and latitude that are not in operation when the case involves review" under the constitutional standard itself. *Harrington v. Richter*, 131 S. Ct. 770, 785 (2011). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Id.* at 786 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)); *see also id.* at 786-87 (petitioner must show the state court's decision "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."). The court "must determine what arguments or theories supported or . . . could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court." *Id.* at 786; *see, e.g. id.* at 788-92 (rejecting 9th Circuit's hypothesized determination that there was no downside risk for counsel to investigate blood evidence and explaining various reasons that the state court could have relied on to conclude otherwise in state court's unexplained denial of the claim).

Here, the state court rejected the claim because there was no evidence whatever from which a reasonable person could conclude that Cheryl consented.[3] The excluded evidence itself would have been the only evidence on the point, and it would have been extremely weak. As the court of appeal pointed out, what Cheryl thought, what was in her

---

[3] Petitioner did not testify.

8

mind, is not relevant to this defense; what matters is what she did, that is, whether what she did could have been interpreted as consent by a reasonable person.

In the first of her excluded statements, Cheryl told Valdivia that she had believed it was her husband when petitioner first touched her intimately, but also that she had turned away from him because he was being rough. The first part of the statement would go only to what was in Cheryl's mind at the outset, evidence irrelevant to the reasonable belief in consent defense, and the remainder of the statement would have been harmful to the defense as manifesting a lack of consent. The other excluded statement to Valdivia was that "when Doug turned on the lights, 'she saw the male on top of her was not her husband.'" There may be an implication that she realized petitioner was not her husband for the first time when Doug turned on the light, but that was not the literal meaning of what she said. And in any event, the statement again does not go to any actions on her part, only her thoughts.

For these reasons, the state court's conclusion that exclusion of the statements "did not significantly impact defendant's ability to present his reasonable mistake of fact defense," which is one way of wording the federal standard for determining if a defendant's right to present a defense has been violated, is not one with which fairminded jurists could disagree. *See Harrington*, 131 S. Ct. at 786. That is, the state court's decision was not contrary to, or an unreasonable application of, clearly-established United States Supreme Court authority.

Alternatively, even if it is assumed that there was constitutional error, that hypothetical error could not have been prejudicial. *See Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993) (habeas petitioner is not entitled to relief unless trial error "had substantial and injurious effect or influence in determining the jury's verdict.") (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)). As the court of appeal explained in the portion of the opinion quoted above, for petitioner to have succeeded on the defense the jury would have had to accept a "series of unlikely propositions" – that "defendant thought Cheryl was Katie, even though Katie had never slept in the bedroom in which Cheryl was sleeping and

Katie always wore shorts, a t-shirt and underwear to bed;" that "he thought Katie, whom he had not even spoken to in years, would welcome his unannounced presence in her bed;" that "a reasonable person would believe that a woman would consent to sexual activity initiated without warning while the woman was asleep by a vomit-covered, intoxicated man sitting on her in the dark;" and that "a reasonable person would interpret as consent the woman's lack of response under these circumstances."

Ex. F at 18.  It is self-evident that no reasonable jury would do so, and as a consequence, the exclusion of the inconsistent statements could not have had a substantial and injurious effect on the jury verdict.

## CONCLUSION

For the foregoing reasons, the petition for a writ of habeas corpus is **DENIED**. Pursuant to Rule 11 of the Rules Governing Section 2254 Cases, a certificate of appealability (COA) under 28 U.S.C. § 2253(c) is **GRANTED** because reasonable jurists could find the court's assessment of petitioner's claim debatable.  *See Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (standard).

The clerk shall close the file.

**IT IS SO ORDERED.**

Dated:  September 15, 2011.

PHYLLIS J. HAMILTON
United States District Judge

P:\PRO-SE\PJH\HC.08\YLIZ4419.RUL.wpd

10